## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CHANTEL SIVELLS,<br><br>      Plaintiff,<br><br>      v.<br><br>SAM'S CLUB,<br><br>      Defendant. | Civ. No. 14-7650 (KM) (MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

*Pro se* plaintiff Chantel Sivells sues her former employer, Sam's Club,[1] for violations of Title VII of the Civil Rights Act of 1964 and for defamation. Sivells, who is female and African-American, alleges that Sam's Club treated men and Hispanics preferentially, and that she was fired for complaining about it. She adds that Sam's supervisors defamed her in the process. Sam's Club has moved for summary judgment. The record paints a picture of a conscientious employee who worked hard and took her job seriously. It also suggests that at least some of Sivells's grievances may be real and substantial. Title VII, however, is a remedy for discrimination, not a salve for workplace tensions and disputes. Because there is insufficient evidence of discriminatory animus, and because the defamation claim is both defective and beyond the statute of limitations, I will grant the motion of Sam's Club for summary judgment and dismiss the complaint.

---

[1]    Sam's East, Inc., is the formal name of the defendant, but I join the parties and use "Sam's Club" or just "Sam's."

## I.    BACKGROUND

### A.    Facts[2]

On March 29, 2011, Sam's Club hired Sivells, an African-American woman, as a part-time cashier. Later that year, in October 2011, she shifted to a position as a part-time gas station attendant. In February 2013, she was made a full-time gas station attendant. (DSF ¶¶ 1, 3, 6; Dep. 122:23-25)

Sam's gas station attendants typically work in four overlapping shifts. One employee opens the station; that "opening" shift begins before 6:00 am and ends early in the afternoon, sometime between 1:30 to 2:30 pm. A second employee arrives at around 7:00 am and leaves around 3:00 or 3:30 pm. A third arrives at 9:00 am and leaves between 5:00 or 5:30 pm. The last two employees close the station; that "closing" shift starts between 1:30 pm and 2:00 pm and concludes around 9:30 pm. (Dep. 25-29)

Sivells preferred the opening shift, although she was available for others. Typically, she was scheduled for the opening shift between two and four times a week. Gas station attendants were permitted to trade shifts with each other if they didn't like their assigned shifts. From June 1, 2013 to November

---

[2]    Citations to the record are abbreviated as follows:

"DSF" — Defendant's Statement of Material Undisputed Facts, ECF No. 38-1

"Dep. __" — Excerpts of the deposition of Chantel Sivells, dated August 17, 2016, attached as Exhibit 2 to the Certification of Salvador P. Simao, Esq., ECF No. 38-3

"9/30/2013 Email" — Email from Chantel Sivells to Jennifer Logan, dated September 30, 2013, attached as Exhibit 10 to the Certification of Salvador P. Simao, Esq., ECF No. 38-13)

"Exit Interview" — Exit Interview Form, dated 11/25/2013, attached as Exhibit 11 to the Certification of Salvador P. Simao, Esq., ECF No. 38-14

"Hurtado Stmt." — Statement of Harold Hurtado, dated November 25,2013, attached as Exhibit 12 to the Certification of Salvador P. Simao, Esq., ECF No. 38-15

"Borahona Stmt." — Statement of Brian Borahona, dated November 25, 2011, attached as Exhibit 14 to the Certification of Salvador P. Simao, Esq., ECF No. 38-17

"Sivells Stmt." — Statement of Chantel Sivells, dated November 25, 2011, attached as Exhibit 15 to Certification of Salvador P. Simao, Esq., ECF No. 38-18

25, 2013, Sivells worked a total of 123 shifts. Of that total, 83, or about over two thirds, were opening shifts. (DSF ¶¶ 4, 7, 35; Dep. 134:23-135:13, 146:6-22)

While employed at Sam's, Sivells felt she was excluded from a clique of female employees, which she calls the "Social Group." Members included "Myra" (Hispanic), "Brittany" (white), "Natalie" (Hispanic), "Tamika" (African-American), and "Carmina" (Hispanic). The Social Group "felt as if they were better than everybody else" and "were untouchable." They didn't like Sivells; Sivells didn't like certain things about them, including their "gossip."[3] Some members of the Social Group, such as Brittany and Carmina, were managers. Others, such as Myra, were supervisors.[4] (Dep. 48:7-16, 51:23-53:15, 62-10:-63:25)

Sivells says that her outsider status negatively affected her shift assignments. After a gas station employee named "Waleska" (Hispanic female) left Sam's, her opening shifts went "up for grabs." Sivells told Brittany, Carmina, and another manager, "Lafina" (African-American female), that she would like Waleska's shifts. Although two male gas stations attendants didn't even want those shifts, management nevertheless split them up among all the gas station attendants.[5] In another instance, "Quadere" (African-American

---

[3]    The tension between the Social Group and Sivells appears to stem from a falling out between Sivells and Myra. Sivells had a second part-time position as a cashier at MetLife Stadium. A friend of Myra's also worked at MetLife, as a parking attendant. At some point, Myra mentioned to Sivells that her friend was stealing from MetLife. Sivells, who had been with "MetLife for five years [and had] never been written up," responded by giving Myra the cold shoulder, and Myra was "put off" by that. Sivells suggests that a contributing factor may have been that Myra and the Social Group were engaging in some questionable conduct of their own at Sam's. (Dep. 66:15-71:7)

[4]    It seems that managers were above supervisors in the chain of command. The parties sometimes use the term "management," but it is not clear whether it refers only to managers, such as Brittany and Carmina, or whether it also includes higher-ups, such as Jennifer Logan, who worked at corporate human resources, or Harold Hurtado, who seems to be the person who actually fired Sivells. For the purposes of resolving this motion, I interpret "management" broadly.

[5]    It isn't clear how many gas station attendants Sam's Club employed in addition to Sivells.

male) was given opening shifts because he was friends with Brittany, even though Sivells was more senior and Quadere was guilty of "stealing company time." (Dep. 124, 126:3-8, 127, 133:3-6; 159:7-161:12)

Sivells also claims that the Social Group was responsible for her having to work through lunch and breaks. On a number of occasions, the gas station attendant(s) scheduled to work the shift following that of Sivells did not show up. When this happened, Sivells would ask for reinforcements, but management "would say they wouldn't have anyone" available to help. So she was forced to "stay[] at the gas station pumping every single car that came in" for "eight hours, six hours, seven hours." Management's inadequate response to her plight, says Sivells, is traceable to the Social Group's personal dislike of her. Out of a total of 492 shifts that Sivells worked as a gas station attendant, this happened seven or eight times. (DSF ¶ 44, Dep. 30:14-31:21, 43:20-25, 45:2-18, 53:6-54:6)

In a September 30, 2013 email, Sivells alerted a corporate human resources manager, Jennifer Logan (African-American female), that "me and my coworkers [were being left] outside alone for hours." She also identified a number of other management failures, including "not properly staffing the gas station," "overlooking the schedules to make sure all shifts are thoroughly covered," excluding gas station attendants from "incentives for good performance," and failing to recognize and appreciate the gas station attendants' contributions to the Sam's team. The email essentially complains about mismanagement and working conditions; it contains no allegation of race, color, or gender-based discrimination. (9/30/2016 Email)

On November 25, 2013, Sam's Club terminated Sivells for "gross misconduct." That morning, Asset Protection Manager Harold Hurtado inspected the gas station and observed debris in the underground gas tanks.[6] Hurtado asked Sivells, who had opened the station, why she had indicated on

---

[6]    Hurtado's race and gender have not been identified.

4

the "Fuel Attendant Opening Checklist" that the tanks were clean. Sivells explained that she first completed the checklist when she arrived in the morning and then performed the required tasks, such as cleaning the tanks, during the course of her shift.[7] That, Hurtado admonished, "was not the right way to do it," to which Sivells retorted: "Whatever. I already signed the damned paper." As Hurtado walked away, Sivells swore at him.[8] For swearing and being disrespectful to management, Sivells was fired. (Hurtado Stmt.; Borahona Stmt.; Exit Interview)

Two or three months after the "swearing" dismissal, in February 2014, Sivells was reinstated. The following month, however, she took a leave of absence. After a year-long absence, on March 25, 2015, she resigned from Sam's, citing personal and health issues. (DSF ¶¶ 68-73)

---

[7]    Sivells says this was the standard practice among the gas station attendants. According to a statement given by a gas station attendant who witnessed the November 25, 2013 incident, "Brian" (male), Sivells told Hurtado that she liked to wait until the shift after hers arrived so that a second person could help her clean the tanks. "Since it usually gets busy in the morning," Brian wrote, the gas station attendants "normally sign[ed] the checklist paper saying they clean[ed] the tank," but "would wait for the 7 a.m. and 9 a.m. shift" to arrive to clean the tanks. (Borahona Stmt; Dep. 8:1-6)

[8]    According to Hurtado, Sivells said: "That['[s all you come for to criticize my work[?] I know how to do my fucking job[.] Why don't you fucking people leave me alone. Just fucking leave me alone." (Hurtado Stmt.) Borahona recalled hearing Sivells say, "I normally sign it and wait for the next person to come in so that there is two people working and I can [illegible] time to clean the tanks. I am not doing my fucking job wrong." (Borahona Stmt.")

    In her papers, Sivells says she did not technically swear *at* Hurtado. What she means is that she "was cursing out of frustration," and not with the intent of insulting the man. Sivells concedes, however, that she did in fact say something along the lines of "I don't understand why they won't fucking leave me alone . . . ." (Dep. 60:23-61:24)

    From Sivells's perspective, her outburst was "just a continuation" of an incident between her and Hurtado from a "few days" prior. Hurtado had chastised her painting something poorly, even though Sivells has bad knees, which made the job difficult. Sivells "let [that incident] go but to be criticized again left [her] extremely upset." (Sivells Stmt.)

Sivells now lives in Virginia. She sells insurance and works at a Food Lion supermarket.[9]

## B.    Procedural History

On January 29, 2014, Sivells filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). On September 11, 2014, the EEOC issued a right-to-sue letter. On December 8, 2014, Sivells filed this action. (ECF No. 1)

On September 30, 2015, Sam's Club moved to dismiss the complaint. Although the standard short-form complaint contained few concrete factual averments of discrimination, I denied the motion. As a *pro se* litigant, Sivells was entitled to some leeway, and the documents submitted in connection with the complaint persuaded me that there was "enough here to warrant at least some discovery." (ECF Nos. 16, 21)

In October 2016, discovery closed. Sam's Club filed a motion for summary judgment on January 13, 2017. The motion is now fully briefed and ripe for decision. (ECF Nos. 35, 38-40)

## II.    DISCUSSION

### A.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The

---

[9]    The documents submitted by Sivells are not marked as separate exhibits, and there are no page numbers. But Sivells has submitted excerpts of her own deposition, and the support for these facts can be found at 176:23-180:2. (ECF No. 39)

moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

If a party fails to address the other party's properly supported assertion of fact, the court may consider "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e). Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a

party does not respond or file a counterstatement. L. Civ. R. 56(a). Sivells has not responded to Sam's statement of material facts. A failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (holding that even where a local rule deeming unopposed motions to be conceded, the court was still required to analyze the movant's summary judgment motion under the standard prescribed by Fed. R. Civ. P. 56(e)).

Because Sivells is a *pro se* litigant, as well as the nonmoving party, I have construed her pleadings and filings liberally. *See, e.g., Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972); *Gibbs v. Roman*, 116 F.3d 83, 86 n. 6 (3d Cir. 1997)). Sivells's papers are unsupported by sworn affidavits, but she has submitted voluminous (and unpaginated) exhibits. Some of these documents are clearly directed to the merits of the summary judgment motion, and others less clearly so. I nevertheless have considered them all. For purposes of this motion, I have credited her factual contentions as if they had been contained in sworn affidavits and insofar as they have record support.

**B.    Analysis**

Sivells asserts two claims. The first, a Title VII claim, is based on two alternative theories: discrimination and retaliation. The second claim is for defamation. The Title VII and defamation claims lack adequate factual support, and the defamation claim is time-barred and defective as well. Summary judgment will be granted as to each.

**1.    Title VII**

"Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer 'to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Kunin v. Sears*

*Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (citing 42 U.S.C. § 2000e-2(a)(1)). Sivells asserts two causes of action under Title VII: (1) racial discrimination and (2) retaliation. Each claim uses a specialized burden-shifting framework in which the plaintiff must first state a *prima facie* claim of discrimination or retaliation. Because there is no evidence sufficient to make out a *prima facie* case that Sivells was discriminated on the basis of a protected characteristic or retaliated against for engaging in a protected activity, her Title VII claims must fail.

### i.    Race or Sex Discrimination

A prima facie case of racial discrimination encompasses four elements: 1) the plaintiff belonged to a protected class; 2) she was qualified for the position in question; 3) she was subject to an adverse employment action; and 4) the adverse action was taken under circumstances giving rise to an inference of discrimination. *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013); *accord Shahin v. Delaware*, 543 F. App'x 132, 136 (3d Cir. 2013); *Rodriguez v. AMTRAK*, 532 F. App'x 152, 153 (3d Cir. 2013).

Sivells contends that she was discriminated on the basis of her race and gender because (a) males and Hispanics were assigned their choice of shifts and (b) she was left alone during her shifts without reinforcements, but men and Hispanics weren't. The first two elements of the *prima facie* case are not in dispute: Sivells is an African-American woman who was qualified to be a gas station attendant. But Sivells has failed to establish the last two elements of the *prima facie* case: that she suffered an adverse employment action, and that the surrounding circumstances give rise to an inference of discrimination.

An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir.

1999) (quoting *Burlington Indus. v. Ellerth*, 188 S. Ct. 2257, 2268 (1998)). It could also be a "substantial[] decrease[] [in] an employee's earning potential" or "a significant disruption in his or her working conditions." *Durham*, 166 F.3d at 153.

No such change in status or disruption occurred here. Having to work an undesirable shift is not an adverse employment action. *See Clayton v. Pa Dep't of Welfare*, 304 F. App'x 104, 106-7 (3d Cir. 2008) (affirming district court's grant of summary judgment for failure to establish an adverse employment action where plaintiff alleged that he was forced to work an inconvenient schedule). Neither is understaffing, or leaving an employee alone for all or part of a shift. *Pagan v. Holder*, 741 F. Supp. 2d 687, 692, 696-97 (D.N.J. 2010) (ruling that working alone in a gymnasium filled with over one hundred federal prisoners is not an adverse employment action). These incidents, although Sivells quite understandably was upset by them, are not adverse employment actions. They are instead garden-variety workplace complaints. Considered individually or collectively, Sivells' grievances do not rise to the level of an adverse employment action actionable under Title VII. *See also Goodall-Gaillard v. N.J. Dep't of Corr.*, Civ. No. 9-954 (KM)(MAH), 2014 U.S. Dist. LEXIS 86527, at *111-114, n.40 (D.N.J. June 24, 2014) (finding allegations that plaintiff was "denied assistance," given "worse assignments," and "a worse work schedule" insufficient to establish discriminatory action), *aff'd*, 625 F. App'x 123, 128 (2015), *cert. denied* 136 S. Ct. 1207 (2016).

For the purposes of argument, however, I will assume that these incidents significantly changed Sivells' employment status or workplace conditions. Her discrimination claim would still fail because there are no facts on which to base an inference of race or gender bias.

Begin with the allegation that Sivells was denied Waleska's opening shifts because she was not Hispanic or male. Those shifts were divided among all the gas station attendants. Even-handed division suggests that management's motivation was fairness or administrative efficiency, not race or

10

gender bias. As to Quadere's opening shifts, Sivells testified that Brittany, the scheduling manager, gave him those shifts because they were friends. (Dep. 161:6-12) Awarding plum shifts to friends may be unfair or an abuse of authority, but without more it does not suggest discriminatory intent. The essential principle is that in a Title VII case, "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Cf. Fuentes v. Perksi*, 32 F.3d 759, 765 (3d Cir. 1994) (in context of rebutting employer's rationale).

I am of course mindful of Sivells's theory here: that the friends to whom management gave the best shifts were male and Hispanic. That membership in a social clique may be a proxy for race or gender is not so far-fetched that I would reject it out of hand. The problem, however, is that the record lacks any evidence establishing even a rough correspondence between preferential scheduling assignments and protected characteristics. Management indeed denied the scheduling requests of similarly situated men or Hispanics—one Hispanic male employee actually quit after management refused to reduce his hours. (Dep. 138:21-139:1, 163:17-164:25) And Sivells's schedule, all things considered, does not seem so unfavorable. She concedes that she opened the gas station (her preferred shift) two to four times per week. (*Id.* 135:4-13) She does not dispute that she got her way much of the time; just over two thirds (67%) of her shifts in the last six months of her employment were opening shifts. (DSF ¶ 35) Sivells, to be sure, would have liked to work even more opening shifts. But bare, unsupported assertions of racial or gender bias do not transform scheduling-related grievances into Title VII discrimination claims.

In short, the facts before me indicate that Sivells opened the gas station frequently, though not as much as she preferred, and that scheduling decisions may have been based on reasons other than merit or necessity. Other than citation of the gender and ethnicity of the participants, Sivells does not offer evidence of discriminatory animus, or even a suggestive pattern. Any Title

VII discrimination claim based on scheduling disparities is not supported by the evidence, and so therefore must fail.

I next turn briefly to the allegation that Sivells was sometimes forced to work without a second person to help, because of her race or gender. Sivells suggests hypothetically that reinforcements would have been sent if she were not an African-American woman. She has proffered no evidence of that. Nor does a pattern emerge from the data. Sivells worked alone seven or eight times out of the total of 492 shifts she worked during her employment at Sam's. (DSF ¶ 44) And there is a plausible, neutral reason for those incidents: they occurred only when the gas station attendant scheduled for the shift following hers did not appear for work. The frequency and context of these incidents do not suggest discriminatory animus. And there is no comparative evidence of what management did in response to no-shows when employees who were not African-American or female were working.[10]

Sivells, in sum, has failed to meet her burden to present specific facts showing a genuine issue for trial. Summary judgment is granted as to the Title VII discrimination claim.

### ii.    Retaliation

Sivells's second Title VII claim is for retaliation. The *prima facie* case for such a claim has three elements: (1) the plaintiff engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Moore v. City of*

---

[10]    At her deposition, Sivells testified that she didn't clock out for lunch for the seven to eight instances in which she was forced to work through lunch, so presumably she was paid for all the time she worked. (Dep. 45:2-18) In the papers, however, she claims that her time sheets were "edited" to show that she took lunch when she in fact did not. Specifics, however, are lacking, including any facts concerning the specific timesheets that allegedly were edited. Timeliness aside (the complaint does not assert a Fair Labor Standards Act claim), this claim would be dismissed for lack of evidentiary support.

*Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (applying *McDonnell Douglas* framework in retaliation case).

As to the first element of a *prima facie* case, there are two classes of "protected activity": (a) participation (which includes formal charges, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII) and (b) opposition (encompassing informal grievance procedures, informal protests, and making complaints to management about acts unlawful under Title VII). *See Moore*, 461 F.3d at 341, 343; *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). An actual Title VII violation need not be proven, but the employee plaintiff must have had an "objectively reasonable belief" that the challenged practice of the employer was unlawful under Title VII. *Moore*, 461 F.3d at 341 (citing *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam)). The opposition to discrimination must have been clear, not equivocal. *Id.*

The second, "adverse action" element of a prima facie case is measured from the point of view of a reasonable employee. The retaliatory action must have risen to a level that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F. 3d at 341 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

The third element of a prima facie case requires a causal connection between the first two. *Id.* at 342. Causation requires a showing of "what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* (citing *Jensen v. Potter*, 435 F.3d 444, 449-50 (3d Cir. 2006)).

Sivells's *prima facie* burden at the first step of the *McDonnell Douglass* framework is not an onerous one, but it has not been carried here. Sivells contends that she was fired for sending the September 30, 2013 email. She has not shown, however, that her message to management was protected activity, or even if it was, that it was the reason she was fired.

As to the first element of the *prima facie* case, the September 30, 2013 email contains no allegation of an "employment practice made illegal by Title VII." *Davis v. City of Newark*, 417 F. App'x. 201, 202 (3d Cir. 2011) (citing *Burlington*, 548 U.S. at 68; *Moore*, 461 F.3d at 341; *accord Curay-Cramer*, 450 F.3d at 135; *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995)). What it contains instead are complaints about management's fecklessness (*e.g.*, persistent understaffing and shoddy scheduling) and lack of appreciation for Sivells and her colleagues (*e.g.*, that no gas station attendant was named employee of the month). Sivells may be commended for going out on a limb to stick up for herself and her co-workers. But "general complaints of unfair treatment" are not a protected activity. *Davis*, 417 F. App'x at 203 (citing *Curay-Cramer*, 450 F.3d at 135). Because Sivells's "sundry complaints to her superiors failed to identify any conduct proscribed by Title VII, they do not amount to 'protected activity,' and thus cannot form the basis of a retaliation claim." *Id.*

Even if the September 30, 2013 email had constituted protected activity, there would not be enough facts here to establish a *prima facie* case of causation. Sivells testified that she doesn't know who, if anyone, was notified of the email (which was sent to Sam's Club's corporate HR department, not to anyone in the Social Group). She does not know if it went to the specific individuals involved in her termination. (Dep. 18:3-18) Indeed, Sivells has not identified, nor have I been able to locate, any factual link between the email and her termination some two months later, on November 25, 2013. Sivells, to be sure, insists that the timing of her termination is suspicious, but temporal proximity alone is not sufficient to establish causation. *Choy v. Comcast Cable Comm'ns*, 629 F. App'x 362, 265 (3d Cir. 2015) (finding six-week period insufficient to establish causation); *Thomas v. Thown of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding three week period insufficient); *accord Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (stating that "[w]e have been reluctant to infer a causal connection based on temporal

proximity alone") (citing *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)). Temporal proximity may take on more significance when there is no other legitimate explanation for the adverse employment action. Sivells admits, however, that she swore at (or in the presence of) a supervisor who criticized her performance on the very morning of her dismissal; that further weakens any inference that her dismissal actually constituted delayed retaliation for a two-month-old email.

Viewing the evidence in the record as a whole, there is no genuine issue of material fact as to whether Sivells was terminated because of protected activity. The motion of Sam's Club for summary judgment on the retaliation component of Sivells's Title VII claim is therefore granted.[11]

---

11      This lack of evidence would also doom the retaliation claim at step three of the *McDonnell Douglass* process.

Assuming Sivells could establish a *prima facie* case of retaliation, the burden would shift to Sam's to provide a legitimate, non-retaliatory reason for Sivells's termination. Obviously, the non-retaliatory reason would have been Sivells's profane, if somewhat understandable, outburst to management on the morning of November 25, 2013. Dropping an f-bomb generally strikes me as a somewhat weak (and almost certainly selectively enforced) reason to terminate an employee, but I think having a foul-mouthed meltdown in response to questioning from a manager is probably a fireable offense. *Cf. Magnusson v. The Hartford*, 258 F. App'x 444, 446 (3d Cir. 2007) (describing employer's burden at step two as "relatively light" and allowing claim to proceed to step three where employer claimed it had fired employee because he had "muttered 'F*** you, mother****'" during a conference call with a client). Under these circumstances, I would find that Sam's Club carried its burden at step two.

In the third and final step, the burden shifts back to Sivells to show that the real reason for her termination was sending the September 30, 2013 letter. At this final "pretext" stage, Sivells's burden is heavier: she would need to "show that she would not have suffered an adverse employment action 'but for' her protected activity." *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 95-96 (3d Cir. 2016) (citing *Uni. of Tex. Sw. Med. Cntr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). The evidence of pretext is very weak, however, and not enough to establish "but-for" causation.

Sivells alleges that other employees engaged in worse—maybe even illegal—conduct than she did. Yet no evidence beyond her say-so is provided. She also claims that because she didn't technically swear at Hurtado, termination was disproportionate to the severity of the infraction. Indeed, she claims that Sam's admitted that her termination was wrong because she was reinstated in February 2014. But her re-hiring does not prove that her firing was motivated by race or gender; it simply shows that Sivells, through the appropriate channels (the parties call it the

### 2.    Defamation

Sivells's last claim is for defamation. Regardless of the merits, it is time-barred. The statute of limitations for defamation in New Jersey is one year. N.J. Stat. Ann. § 2A:14-3. Sivells points to a number of allegedly defamatory statements, all of which occurred on November 25, 2013, or thereabouts. Sivells filed her complaint on December 8, 2014, more than one year after the utterance or the publication of the allegedly defamatory statements. The issue of tolling has not been raised, nor is there reason to believe that tolling is appropriate on these facts.[12] I therefore grant Sam's Club's motion for summary judgment as to Sivells's defamation claim.

---

"Open Door Process"), asked to be reinstated, and was successful. All the reinstatement demonstrates, in other words, is that Sivells was given a second chance. More generally, "[i]t is not enough to show that the termination was wrong or unfair. The evidence must allow a reasonable juror to conclude that the Defendants were motivated by discriminatory intent." *Magnusson*, 258 F. App'x at 446 (citing *Fuentes*, 32 F.3d at 763). Based on this record, no reasonable juror could conclude that the stated reason for her termination was a cover for discriminatory animus.

[12]    Federal courts apply state tolling principles to supplemental state law claims. *E.g., Polkampally v. Countrywide Home Loans, Inc.*, Civ. No. 130174 (RBK/JS), 2013 U.S. Dist. LEXIS 158672, at *8-10, 23-27) (D.N.J. Nov. 6, 2013). In New Jersey, the statute of limitations may be tolled by statute, *e.g.*, N.J. Stat. Ann., § 2A:14-21, 14-22, by the discovery rule, *e.g., Guichardo v. Rubinfeld*, 177 N.J. 45, 51 (2003), or pursuant to equitable tolling principles, *e.g., Polkampally*, at *26 (citing *Villalobos v. Fava*, 342 N.J. Super. 38, 50 (App. Div. 2001), *Freeman v. State*, 347 N.J. Super. 11, 31 (App. Div. 2002)). Those doctrines have no application here.

As to statutory tolling, the listed bases are absent. As to the discovery rule, it may not apply to defamation claims at all. *E.g., Nuwave Inv. Corp. v. Hyman Beck & Co., Inc.*, 221 N.J. 495, 500-01 (2015). In any case, there are no facts suggesting that Sivells did not know, or could not have discovered through the exercise of reasonable diligence, the allegedly defamatory or slanderous statements of which she complains. *See Guichardo*, 177 N.J. at 51. There is likewise no indication that Sivells was "induced or tricked by [her] adversary's misconduct into allowing the filing deadline to pass," was prevented "in some extraordinary way" from asserting her rights, or "timely asserted [her] rights mistakenly by either defective pleading or in the wrong forum." *Polkampally*, at *26.

I also note that, as a matter of federal law, the Courts of Appeal for the Second, Seventh, and Ninth Circuits have held that filing a discrimination charge with the EEOC does not toll the statute of limitations applicable to a state tort claim based on the same set of facts. *See, e.g., Castagna v. Luceno*, 744 F.3d 254, 257-58 (2d Cir. 2014); *Juarez v. Ameritech Mobile Comm'ns, Inc.*, 957 F.2d 317, 323 (7th Cir. 1992);

Even if not time-barred, the defamation claim would surely fail. Under New Jersey law, the elements for written and oral defamation (slander) are as follows: (1) a false and defamatory statement concerning the plaintiff, (2) communicated to a third party, with (3) a sufficient degree of fault. *See Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011) (citing *Singer v. Beach Trading Co.*, 379 N.J. Super. 63, 79 (App. Div. 2005)). Sivells alleges five defamatory or slanderous statements: (1) Hurtado's written statement addressing the November 25, 2013 incident; (2) Borahona's written statement addressing the same; (3) "Swaveck's" statement to "Steven" that Sivells had been "written up before"; (4) Steven's statement to Sivells that customers had complained about the November 25, 2013 incident; and (5) Steven's statement to Sivells that she had been "yelling and screaming and hollering" during the same. (Dep. 118:2-122:19) Each fails to satisfy at least one element of a defamation cause of action.

As to the written statements of Borahona and Hurtado, Sivells points to certain inconsistencies between them, but offers nothing to establish the falsity of their contents. To the contrary, the statements actually corroborate the essential facts of the November 25, 2013 incident: that Sivells became frustrated when Hurtado questioned her about filling out the checklist when she had not yet performed the tasks, and objected using inappropriate language. Nor is there any evidence that Swaveck's statement to Steven that Sivells had been "written up before" was false (or really that it was said at all). In addition, Steven's statements that customers had complained and that

---

*Arnold v. United States*, 816 F.2d 1306, 1313 (9th Cir. 1987). The New Jersey Supreme Court has yet to consider the tolling effect that a pending federal administrative claim of discrimination charge has on a claim under state law. Forced to decide the issue, I would predict that the New Jersey Supreme Court would hold that the filing of an EEOC charge does not toll the limitations period for a tort based on related facts. *Cf. Mincin v. Shaw Packing Co.*, 989 F. Supp. 710, 717-20 (W.D. Pa. 1997) (D. Brooks Smith, J.) (addressing Pennsylvania law); *Kolenikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 122-23 (S.D.N.Y. 2009) (addressing New York law and noting that "'the vast majority' of courts in this District have held that the statute of limitations for state tort claims is *not* tolled during the pendency of an administrative discrimination charge.") (emphasis in original)).

Sivells had been "yelling and screaming and hollering," were made to Sivells herself, not to third parties.

In short, the record lacks the evidence necessary to establish a triable defamation claim. As an alternative ground for dismissal, I would therefore grant Sam's Club's motion for summary judgment for failure to raise a genuine issue of material fact as to any of the five instances of defamation alleged.

## III.    CONCLUSION

For the foregoing reasons, the motion of Sam's Club for summary judgment (ECF No. 38) is GRANTED, and the entire Complaint (ECF No. 1) is DISMISSED WITH PREJUDICE. An appropriate Order accompanies this Opinion.

Dated: July 25, 2017

**KEVIN MCNULTY**
**United States District Judge**